CÁNDIDO FERNÁNDEZ, demandante y apelante, *v.* ISIDORO ALVAREZ, demandado y apelado.

No. 5571.—*Sometido:* Diciembre 9, 1931. *Resuelto:* Noviembre 25, 1932.

C. *Coll y Cuchí* y *Luis R. Polo,* abogados del apelante; *Henry Brown,* abogado del apelado.

EL JUEZ PRESIDENTE SEÑOR DEL TORO, emitió la opinión del tribunal.

Reclamó en este pleito el demandante del demandado la suma de cuarenta y seis mil dólares y la Corte declaró no sólo sin lugar sino maliciosa su reclamación. No conforme el demandante apeló, señalando en su alegato cuatro errores todos los cuales versan sobre la práctica y la apreciación de las pruebas.

La demanda, en lo que estimamos pertinente transcribir, copiada a la letra, dice:

"2.—Que el demandante el día 23 de marzo de 1929 consintió en pagar y pagó a don Benigno Díaz por cuenta del demandado la suma de CUARENTA Y SEIS MIL DOLLARS ($46,000) que el dicho demandado

adeudaba al dicho Benigno Díaz, habiendo efectuado dicho pago con el conocimiento y consentimiento de dicho demandado y a los fines de solventar la ameritada deuda existente entre el dicho demandado y el dicho Benigno Díaz, recibiendo el dicho Benigno Díaz por cuenta y orden del demandado a su satisfacción dicha suma de CUARENTA Y SEIS MIL DOLLARS en buena moneda de los Estados Unidos.

"3.—El demandado se comprometió y obligó con el demandante a devolverle dicha suma el día 31 de mayo de 1929 sin interés de ninguna clase.

"4.—El demandado no ha devuelto al demandante dicha suma, ni parte alguna de ella a pesar de haber sido requerido para que lo efectuara de acuerdo con su obligación en y después de la fecha de 31 de mayo de 1929.''

El demandado la excepcionó y contestó negando específicamente todos sus hechos esenciales. Fué el pleito a juicio. Ambas partes presentaron evidencia testifical, documental y pericial. Basándose en un examen de la misma, llegó la Corte sentenciadora a las siguientes conclusiones:

"1ª.—Que el demandante no ha probado los hechos 2, 3 y 4 de la demanda enmendada.

"2ª.—Que el documento Exhibit 'B' del demandante, que es la base de este pleito, es un documento falsificado.

"3ª.—Que en el mes de marzo de 1929 y con anterioridad al día 23 de dicho mes, el demandado Isidoro Alvarez no debía a Benigno Díaz la suma reclamada de $46,000 ni ninguna otra suma de dinero, y

"4ª.—Que la reclamación presentada por el demandante Cándido Fernández contra el demandado Isidoro Alvarez es maliciosa e injusta, y que se ha tratado en este caso de realizar por el demandante un fraude contra el demandado.''

Para la debida resolución de todas las cuestiones envueltas nos vemos obligados a resumir la prueba.

El primer testigo que declaró por la parte demandante fué el demandante mismo Cándido Fernández, mayor de edad, casado, vecino de Hato Rey, Río Piedras, residente en la isla desde hace diez y nueve años. Conoció a Benigno Díaz, hombre de negocios de Caguas que le visitaba frecuentemente. A fines de marzo de 1929 fué a verlo y le dijo: "Que él necesitaba un dinero; que había un señor en Caguas que le debía

una cantidad que le había entregado en diferentes veces para que la invirtiera de acuerdo con las instrucciones que ellos dos habían convenido, . . . Que ahora él necesitaba que esa persona le diera esa cantidad y al efecto la llamó y esa persona le dijo que tenía que darle algún tiempo para podérsela conseguir. . . . Me preguntó si yo tenía dinero y le dije que sí, que precisamente estaba realizando todo lo que tenía para marcharse a España y él me dijo que necesitaba cuarenticinco mil pesos, que él me daría un documento por cuarentiseis mil de esa persona que se los debía a él y yo le pregunté cuáles eran las condiciones de él, y él precisamente sacó una libreta y me pidió un papel y me hizo esta nota, además de eso, me dijo, la persona que le va a presentar el documento es mucho más responsable que yo.''

La nota fué presentada como prueba y admitida con la objeción del demandado. Se marcó con la letra ''A''. No figura entre la prueba documental transcrita.

Continuó el testigo declarando:

''En vista de esa conversación y de ese estado que le presentó el señor Díaz de su situación financiera, ¿qué convinieron Uds.?—Me dijo, además, que el dinero ese lo retendría solamente un mes y que yo le haría un gran favor, si se lo facilitara. Yo no tuve inconveniente; lo conocía y sabía que era una persona honorable y le dije que si no era nada más que por un mes, le daría los $45,000.00; que me trajera el documento ese y que podía venir a buscar el dinero cuando quisiera. . . Al día siguiente, después de almuerzo me acosté un rato y me levanté y vine a San Juan, tenía que ver al licenciado Agosto y al pasar por Fortaleza y San Justo, me llamaron: miré y vi que era don Benigno. . . . Paré, él se acercó a mi carro y me dijo que venía a buscar el dinero ese y que traía el documento. Entonces, le dije que se montara en mi carro, en vista de que él me dijo que su carro estaba por la Marina, fuimos a casa y se sentó en el comedor . . . le ofrecí un maletín para que metiera el dinero, lo metió en la maleta, después salimos los dos para San Juan en mi carro y lo dejé frente al Teatro Municipal. . . . Le dí tres paquetes de billetes de a CIEN; ocho de a CINCO, creo que fueron diez de a DIEZ y cincuenta monedas de a VEINTE pesos de oro.''

Preguntado por su abogado: ''Cuando usted le hizo en-

trega de ese dinero y él lo guardó en la maleta que usted ha mencionado, el señor Díaz ¿qué le entregó a usted?'', contestó: ''El documento''. Y al mostrarle un documento: ''Este mismo fué.''

El demandante por su abogado introdujo como prueba ''el documento''. Se opuso el demandado porque no se había demostrado su autencidad, y la corte lo admitió haciendo constar que lo hacía teniendo presente la objeción del demandado. Este tomó excepción. El documento copiado íntegro de su original que fué elevado con la transcripción, dice:

''Caguas, P. R. Marzo 23/1929.—Sr. Benigno Díaz, Caguas, P. R.—Estimado Benigno:—No estando en condiciones, como te dije anteriormente, de disponer de los $46,000 (Cuarentiseis Mil Dollars) que te debo, deseando serte todo lo útil posible en estos momentos decisivos para ti, ya que has encontrado un amigo que con mi firma te facilita esa suma, me complace hacer a continuación el documento que me copias, variando la fecha del vencimiento solamente, por serme imposible hasta fines de mayo del cursante año poder atender debidamente tal obligación.

''Después de este compromiso que dejo contraído, te estimaré me mandes con el portador recibo por saldo de todas nuestras cuentas.

''Recibí de D. Cándido Fernández, por mediación de D. Benigno Díaz, la suma de $46,000 (Cuarentiseis Mil Dollars) en calidad de depósito y sin intereses, cuya suma devolveré en mayo 31 de 1929 (Mil Novecientos Veintinueve), a la presentación de este documento, o a su orden y en su domicilio.''

La firma para una persona que no la conozca es difícil de entender. Al copiarse en la transcripción se consigna: ''Fdo. Isidoro Alvarez.''

Siguió declarando el testigo que pocos días después de la entrega del documento, Benigno Díaz se suicidó. Quince días antes de vencerse, escribió a Alvarez y recibió la siguiente contestación telegráfica:

''Como nada debo, ningún documento he firmado al Señor Díaz.''

La carta que el testigo dirigiera a Alvarez presentada luego por éste dice:

''Me permito recordarle para su gobierno, que el día 31 del co-

rriente mes, vence el documento que tengo en mi poder otorgado y suscrito por Ud. como pago de lo que adeudaba a Dn. Benigno Díaz.''

Contestando al abogado del demandado dijo el demandante:

''Yo estuve establecido con fábrica de licores antes de la prohibición y después he tenido varias veces perfumería y fábrica de alcoholado. . . . En donde mismo tenía la fábrica de licores puse a continuación de la prohibición, fábrica de alcoholado; después puse otra y la cerré, o la cerró el gobierno, . . . alegando que yo hacía mal uso del alcohol y que había adulterado fórmulas y demás, y después puse otra a nombre de . . . y que la cerraron también porque yo hacía mal uso del alcohol, entonces la puse a nombre de José Pilar Ramos en la calle de Loíza y después continué fabricando licores sin alcohol y en eso estoy todavía.''

Conocía mucho a Benigno Díaz y en otra ocasión le facilitó $16,000 que le devolvió religiosamente. Conocía de vista a Isidoro Alvarez pero no lo había tratado ni tenido negocio alguno con él. El 22 de marzo fué que Díaz le propuso el negocio. Cuando el 23 estaba entregando el dinero a Díaz llegó a su casa Aurelio Miró y le dijo que volviera al día siguiente. Después de explicar que había vendido una casa y cobrado un pagaré y tenido otras negociaciones dijo:

''Después que me cerraron la última perfumería yo continué fabricando licores sin alcohol y en eso puedo asegurar que he ganado más de 30,000 pesos. . . . En los tres años gané más de cincuenta mil pesos, . . . Yo he tenido días de ganar diez mil pesos. . . . El día que me traían diez drums de alcohol me ganaba diez mil pesos. . . Eso era cuando tenía la perfumería que me cerraron la fábrica porque decían que yo hacía mal uso del alcohol.''

A pesar de haber ganado tanto dinero nunca pagó contribución sobre ingresos. Tenía el dinero en su casa, ''en un sitio que hice expresamente para esconderlo.'' Refiriéndose a Díaz dijo:

''Era un hombre que estaba de acuerdo conmigo en su manera de actuar y de pensar.''

No conocía la firma de Alvarez. Le bastaba que Díaz le

entregara el documento para tener la seguridad de que era bueno. Aunque el documento dice $46,000 él entregó $45,000 porque le daban $1,000 "por un mes que tendrían ese dinero." Díaz no le dió ninguna otra garantía. Supo que Díaz estaba en malas condiciones, pero después de su muerte.

Es falso que fuera donde el Notario Soto Rivera para que legalizara la firma haciendo constar que Alvarez había firmado ante él. El documento al socio de Jiménez García se hizo a nombre de Félix Torres. Estaba hecho el documento y él se lo negoció a Torres. Tuvo un pleito por una pianola que pagó y le fueron a cobrar dos veces, "me demandaron, presenté el recibo pagado a la corte y me fallaron el asunto a favor."

El segundo testigo que declaró fué Carmen Camacho, de Caguas, industrial, que conoce al demandado Alvarez y conoció a Benigno Díaz quien vivía en el barrio de Turabo. A fines de marzo Alvarez lo ocupó para que le llevara una carta cerrada a Díaz. La llevó y Díaz le dió un sobre abierto para Alvarez. Vió el contenido del sobre y era un recibo. "El recibo decía 'he recibido de don Isidoro Alvarez la suma de cuarenta y seis mil dollars por saldo de todas nuestras cuentas.'" Entregó personalmente el recibo a Alvarez. Encontró a Alvarez en Caguas en la calle como a las once y fué con él a su casa y le entregó la carta. Ya la tenía escrita. Salió. Cogió una guagua. Se apeó en la casa de Díaz. Al entregarle la carta, Díaz le preguntó "¿Vuelve al pueblo?" y le contestó "Sí, señor, más tarde" y le dió el recibo. Repreguntado sobre el contenido de éste volvió a contestar: "He recibido de don Isidoro Alvarez la suma de cuarenta y seis mil pesos por saldo de todas nuestras cuentas." Fué la primera y única vez que le ocupó don Isidoro. Nada le pagó. Tanto Alvarez como Díaz estaban solos. Nada dijo del incidente a sus amigos. Advertido de que si era así, cómo vino a declarar, contestó: "Porque días después de la muerte de don Benigno se hablaba que él había muerto por falta de dinero, se comentaba eso allí y un día yo estaba

frente a la tienda de la casa donde él vivía y se comentaba entre varios de la muerte de don Benigno y yo decía que por falta de dinero no podía ser porque yo había traído un recibo a don Isidoro Alvarez de cuarentiséis mil pesos de dinero y creía que él había cogido dinero en esos días. . . . Y había algunos carros frente a la tienda y aquel señor. . .—Juez: ¿Qué señor?—Dte. Señalando al demandante. R. Se tiró del carro, se fué hacia mí, me llamó, desde luego, que yo me sorprendí porque no lo conocía y me dijo: '¿Ud. me quiere hacer el favor de ir a declarar conmigo; yo soy interesado en conseguir a alguien que me aclare este asunto, porque yo tengo un dinero aquí comprometido.' y yo le dije que no tenía inconveniente, que de venir con él tendría que volver a mi casa, entonces me llevó hasta casa. . . . Ddo. ¿Cuándo fué eso?—R. Como al mes de haber muerto don Benigno, más o menos." Nada le pagó el demandante ni antes ni ahora porque declarara. Conoce a Félix Torres de Caguas. "No es amigo ni enemigo; es conocido."

Siguió a Camacho el testigo Aurelio Miró. Fernández le ha facilitado dinero algunas veces y en marzo fué a su casa y lo encontró en la mesa del comedor con otro señor que no conocía. "Estaban contando dinero. En billetes de banco que yo los vi. Bastantes." Fernández le dijo que volviera otro día porque estaba muy ocupado en un negocio y tenía que salir. Recuerda "que ellos tenían un lápiz en la mano cada uno y una maleta en el medio y alrededor de la maleta unos paquetes de dinero."

Aurelio Vélez, otro testigo del demandante, conocía a Don Benigno Díaz, tenía amistad pasajera con él, recuerda haberlo visto en Caguas en los primeros días de abril, habló con él y a la pregunta "¿Y le significó que venía para San Juan?", contestó: "Se acercó a la plaza, que yo venía para San Juan y me dijo que si conocía a Cándido Fernández y le dije que no lo conocía, pero que si necesitaba que yo le servía y me mostró una maleta que tenía en la mano y me dijo que cuando venía parara en la estación de Martín Peña en Hato Rey, y

que le dijera a don Cándido que en los paquetes de billetes de a cien, faltaban tres, que cuando viniera a San Juan arreglaría con él. . . Yo vine, me desmonté en Hato Rey y pregunté a un señor que estaba allí dónde vivía don Cándido y me señaló la casa, entonces yo me metí por la puerta de atrás y llamé y se presentó don Cándido Fernández, entregué el maletín y le di la razón que él me dió, era una de esas maletas de esas que son de comisionistas, negras.''

Blas Delgado declaró que conocía a don Benigno Díaz. Tenía un carro que don Benigno utilizaba para sus viajes. A últimos de marzo por la mañana salieron de Caguas para San Juan. No traía equipaje. Dejó el carro frente a Alonso Riera en San Juan. ''Cuando yo vine como a las tres más o menos, él estaba esperándome en el carro y había una maleta dentro del carro.''

Siguió la prueba de peritos calígrafos con la que cerró su caso el demandante. Los peritos fueron Félix Vega Nevares y Pedro C. Timothée. Refiriéndose ''al documento'' el primero concluyó: ''Que el documento indubitado es auténtico de toda autenticidad y virgen de falsificaciones y adulteraciones''; y el segundo: ''Estudiando esto detenidamente, me di cuenta, comparando estas firmas, me di cuenta que en este caso no solamente no había falsificación, sino que era casi imposible que la hubiera, por la condición especial y característica del escrito.''

La prueba del demandado comenzó por la del testigo José Vercher, Director Cajero de la Sucursal del Banco Territorial y Agrícola en Caguas. Conoció a Benigno Díaz. Tenía negocios en su banco. En marzo les estaba debiendo. El mismo le dictó un estado de su situación financiera en el que no figuraba crédito alguno contra Isidoro Alvarez. La situación de Díaz era completamente difícil. ''El Banco deseaba hacer efectivo su crédito y él no podía desenvolverse. El mismo procuró buscar un crédito, hablando conmigo, en el Royal Bank of Canada, en el Banco de Ponce. . . Y no lo consiguió.''

Se introdujo como prueba la copia de la cuenta corriente de Díaz con el banco reconocida por el testigo. En marzo 23 había un sobregiro de $19,000. Al finalizar el mes el sobregiro subió a $39,809.65. La deuda total de Díaz para con el banco era aun mayor. La cuenta de Díaz "era unos giros que este señor descontaba a la casa de Madera Tobacco de New York; el banco creía que esto respondía a embarques de tabaco pero luego resultó que no era así."

Ernesto Fernando Schlüter, entonces gestor de Schlüter y Co. y Presidente del Banco Industrial, dijo que conoció a Díaz desde 1918, era su agente en Caguas y cliente fuerte de abono. En marzo 1929 le solicitó un préstamo de treinta mil dólares. No pudo facilitárselo y lo acompañó a otros bancos también sin éxito. Sabe que necesitaba esa cantidad para pagar unos giros que tenía descontados en el Banco Territorial que vencían del quince al treinta de marzo. En el estado financiero que le presentara no figuraba crédito alguno contra Alvarez. El testigo trajo consigo la hoja de depósitos, cuenta corriente, de Díaz en el Banco Industrial. El 23 de marzo de 1929 hubo un depósito de $2,630.30, hecho por Blas Delgado consistente en dos cheques y ese mismo día se pagó en el banco un cheque de Díaz por $2,000. Blas Delgado era el que llevaba los depósitos. La cuenta final de Díaz en abril arrojaba un saldo a su favor de $562.68 que le fué entregado a un márshal a virtud de un embargo. Declara también sobre la buena reputación de Alvarez.

José Madera, otro testigo del demandado, declaró que el 23 de marzo vió a Díaz en Quebradillas, Caguas. Fué a cobrarle un giro suyo que se vencía y le pagó con un cheque contra el Banco Territorial que depositó en el Royal Bank of Canada. Lo vió como entre 10 y 10½ de la mañana.

Antonio Longo y Cipriano Manrique declaran sobre la difícil situación en que se encontraba Benigno Díaz y sobre las gestiones que con él realizaron para ayudarlo, a condición de que Díaz anulara los traspasos de bienes que había hecho y los trajera de nuevo a la masa común. Ambos tes-

tigos refiriéndose a la reputación de Alvarez la calificaron de intachable y excelente.

Alberto F. Balzac, gerente por aquel entonces de la Sucursal del Banco Colonial en Caguas, dijo que Díaz en el mes de marzo fué a verlo en solicitud de un préstamo de treinta mil dólares, le pidió un estado financiero, no se lo envió y en vista de ello escribió a San Juan para que no consideraran la operación. Conoce a Isidoro Alvarez y afirma que goza de "muy buena reputación y de buen crédito también."

Jorge M. Grindell, Sub-Gerente del Royal Bank of Canada en San Juan, conocía a Benigno Díaz quien en marzo de 1929 visitó el banco en solicitud de un préstamo de treinta mil dólares presentando un estado de cuentas en el que no aparecía deuda alguna de Isidoro Alvarez. Repreguntado que si se deposita en su banco un cheque contra el Banco de Caguas a la una del día, cuándo se remite a Caguas, contestó: "El mismo día por correo."

Félix Aróstegui, manager de Durlach Bros., conoció a Benigno Díaz y a Isidoro Alvarez. Cuando éste se ausentó para España en 1928 quedó como su apoderado. Preguntado: "¿Y cuál era el negocio del señor Alvarez en ese tiempo?", contestó: "En ese tiempo dejó tabaco por liquidar que le liquidó don Antonio Longo y el dinero fué entregado en el Territorial. El señor Alvarez dejó en cada sobre el detalle del dinero que había tomado cada colono de él y la cantidad de tabaco que había quedado en el almacén de la Colectiva que fué el que liquidó a los refaccionados de don Isidoro Alvarez aunque los refaccionados de don Isidoro Alvarez habían convenido en que el tabaco sería pagado un peso menos que la liquidación de la Colectiva, yo como apoderado di órdenes a don Benigno que pagase al mismo precio que la Colectiva que fué 24 centavos; entonces don Benigno al que le sobraba le dió un cheque de él y el sábado venía Blas Delgado donde mí con una nota de los cheques que él había expedido y yo le daba entonces un cheque de don Isidoro por

las cantidades que él había pagado. . . . Después cuando vino el señor Alvarez de España él arregló los cosecheros que no les había sobrado. Los que le sobraron vinieron a arreglar con don Benigno. En agosto 4 le entregué un cheque de $248.78 contra el Banco Territorial y Agrícola de Caguas y en agosto 18 le entregué otro de $37.96. Con esas dos cantidades fué cubierto lo que Benigno Díaz había pagado a distintos refaccionados de Isidoro Alvarez.—P. ¿Ud. sabía de alguna otra cantidad que debía don Isidoro Alvarez a Benigno Díaz?—R. No señor, porque cuando don Isidoro se fué para España me dejó una nota de las cantidades a quien tenía que pagar.—P. ¿En esa lista figuraba don Benigno Díaz?—R. No, señor.''

Se llamó entonces a declarar al propio demandado. Dijo que fué comerciante en Caguas hasta que embarcó para España en 1928. Conoció a Benigno Díaz quien también era comerciante dedicándose luego a compra y venta de tabaco y refacciones agrícolas. Además de su comercio el testigo prestaba algún dinero. Poco antes de embarcarse prestó unos veinte y cinco mil pesos con garantías hipotecarias. También refaccionó en una escala pequeña. No tuvo negocios con don Benigno. Sólo lo ocupaba algunas veces en compras de abono. Preguntado: ''¿Ha habido algún otro concepto en que Ud. ha debido a Benigno Díaz?'', contestó: ''Nunca, nunca. Cómo él iba a prestarme si él había tres a cuatro años que venía trabajando muy forzado en su crédito y en todo.'' Y vuelto a preguntar: ''¿Es cierto que en el mes de marzo de 1929 Ud. le debía a Benigno Díaz, cuarenta y seis mil pesos?'', respondió: ''Nunca le ha debido ni a él ni a nadie esa cantidad. En los muchos años que he sido comerciante, nunca he cogido esa cantidad, porque mis negocios no me lo permiten siendo en pequeña escala.''

Explicó que sus bienes consistían en fincas urbanas y rústicas y créditos hipotecarios, pagando al tesoro de Puerto

Rico contribuciones por una valoración de más de cien mil dólares. En marzo de 1929 tenía su cuenta corriente en el Banco Territorial con saldo a su favor. No tenía deudas.

Refiriéndose a la declaración del testigo del demandante Camacho manifestó que era incierto que le entregara carta alguna para Díaz ni existía motivo para ello, "porque a don Benigno lo veía yo pasar por mi casa tres o cuatro veces al día, porque él vivía en el pueblo y venía a almorzar, acababa de almorzar e iba para el campo. Eran muchos los días que nos veíamos tres o cuatro veces al día. El venía a almorzar a su casa al pueblo y tenía que pasar por mi casa."

En relación con el documento expresó:

"Nunca estuvo en mis manos; ni nunca lo he visto ni he sabido de él hasta el día que fué llevado a su bufete. Fué la primer vez que lo he visto, pero nunca había estado en mis manos."

Dijo que la firma que figuraba al pie del mismo no era suya. No sabe escribir en maquinilla, ni tiene maquinilla. Cuando se ve obligado a escribir alguna carta a persona de consideración va al Banco Territorial y uno de sus empleados se la prepara.

Sigue entonces el siguiente interrogatorio que copiamos textualmente:

"P. ¿En alguna ocasión Ud. ha firmado alguna carta a petición de otra persona?—R. Sí, señor.—P. Muchas veces o . . . . .—R. Varias, pero la última ya hace algún tiempo que la he firmado.—P. ¿Qué clase de carta fué ésa?—R. Yendo un día yo de mi casa para la plaza al entrar y en el medio de la plaza me encontré con una cosa de golpe, de sopetón, con un señor que hay allí llamado Félix Torres que me dice: 'Hombre, tengo que hacerme una operación en el Auxilio Mutuo y no tengo nada más que cien pesos; yo quisiera que Ud. me diera una carta de recomendación o me firmase esta carta de recomendación para ver si lo consigo que me la hagan por esta cantidad.' Y entonces yo me negaba a firmarla porque yo no era el representante del Auxilio Mutuo en Caguas, sino que era Celedonio Pérez, entonces yo le manifesté que yo podría conseguir de don Celedonio Pérez que le firmase la carta a lo que me contestó que no, que él quería la firma mía y entonces, le firmé la carta con una tinta

de color especial, escrita a la mano en un papel de maquinilla.—P. ¿La carta fué escrita a la mano?—R. De mano por él u otro porque no estaba en maquinilla.—Juez. P. ¿U., lo que dice es que la carta que le presentaron a Ud. para firmar era un papel de maquinilla y estaba escrita con la mano?—R. Sí, señor con la mano, una tinta de un color especial.—Ddo. P. ¿Y donde fué que se firmó esa carta?—R. Esa carta fué firmada en el mismo cafetín que tenía El Chévere, detrás del Banco Territorial. Era uno de los Chéveres; era un cafetín que había allí de los Chéveres.—Ddo. Aquí ha declarado Carmen Camacho; Aurelio Vélez. . . .—R. Pues ese Vélez, son alias Chévere, es el mismo que tienen en Caguas; que tenían un cafetín de tres puertas detrás del Banco Agrícola.—P. ¿Y fué en ese sitio que firmó la carta que le pidió Félix Torres?—R. Sí, señor.—P. ¿Y cómo es que Ud. se acuerda de esa carta?—R. Recuerdo eso porque fué en los primeros días de julio o fines de junio del veinte y seis, fecha que recordaré mientras viva y a los pocos días se llevó a Caguas el cobro de un documento que se habló mucho y debido a eso fué que recordé la fecha, porque la apunté.—P. ¿Quién tenía que ver con ese documento?—Dte. Yo me opongo a otro documento que no sea el documento en litigio.''

Preguntado: "Ud. ha visto o hablado alguna vez con el demandante en este caso?'', contestó:

"Nunca lo conocí; ni nunca le he visto, ni nunca me he dirigido la palabra ni con él ni con ninguno de sus cuatro o cinco abogados que ha tenido.''

Recibió la carta de 15 de mayo el 16 y la contestó. No ha tenido otra comunicación.

Hasta ahí el interrogatorio directo. Fue largo el de repreguntas y el testigo se sostuvo siempre en sus posiciones.

La declaración del perito químico Rafael del Valle Sárraga ocupa unas cincuenta páginas de la transcripción. Dijo, en resumen, que los métodos que se usaban para falsificar firmas y documentos eran:

1. Sobreponiendo un papel escrito sobre otro en blanco en cuya parte sobresaliente se va a estampar la firma.

2. Haciendo desaparecer todo o parte de un escrito sobre una firma auténtica para sustituir en el espacio ocupado por el escrito borrado lo que interese el falsificador.

3. Calcando la firma.

4. Haciendo facsímil de una firma auténtica.

Cuando la firma se consigue mediante la sobreposición de un pliego de papel escrito sobre uno en blanco, muchas veces se ha hecho de tal manera que no queda rasgo alguno indicando que tal método se ha empleado. En estos casos, en la mayoría de ellos el falsificador ha conseguido su objeto.

Cuando se hace desaparecer mediante reactivos químicos lo escrito en una hoja encima de una firma, si el escrito ha sido con tinta a base de hierro o a base de campeche, se puede hacer reaparecer las letras así borradas mediante la aplicación de gases químicos, el hidrógeno sulfurado. Pero cuando la tinta que se ha usado en el escrito que se ha hecho desaparecer es tinta a base de negrosina o de cualquier otro color de anilina, no podría después conseguirse el más mínimo destello de que ese escrito se hizo en el documento anteriormente.

Una firma grabada es bastante perfecta, mientras que la firma calcada presenta rasgos al microscopio de un sierra sin dientes, tal como si temblara la mano del que escribía; pero la otra falsificación, la que se consigue por medio de grabados de metal puede hacerse a una semejanza tan grande a veces que con el microscopio es difícil diferenciar la firma hecha en esta forma de la que se hiciera por el propio individuo que se supone que la hizo.

Por último nos referiremos a lo ocurrido con motivo de la declaración del Abogado Notario José Soto Rivera. Preguntado: "¿Recuerda Ud. de alguna ocasión, de una conversación con Cándido Fernández en el año pasado después del mes de abril del año pasado, respecto a la legalización de la firma de Isidoro Alvarez en un documento que él traía?", contestó: "El señor Cándido Fernández, no puedo precisar exactamente la fecha, porque iba a menudo a mi oficina y llevo muchos asuntos de él, me evacuó una consulta respecto a un documento pero fué en calidad de cliente y abogado y

yo no me creo ahora autorizado para declarar aquí lo que habláramos sobre ese asunto, lo que me consultó.''

Se discutió si el testigo estaba o no obligado a declarar y resuelto que lo estaba contestó: "Que me fué presentado por el señor Fernández quien me consultó si sería posible legalizar esa firma. Entonces yo le dije que la única manera de legalizarla era trayendo de nuevo la misma persona que lo firmó y reconociera que ésa era su firma y entonces podría hacerse constar en el documento que aquella persona reconocía que aquélla era su firma.''

Continuó el interrogatorio así:

"P. ¿Ud. recuerda la conversación que tuvo conmigo hace un par de días?—R. Una conversación completamente privada en la cual le manifesté que lo que yo hablé con Ud. no podría hacer uso de esa conversación ni yo tampoco.—P. ¿Recuerda haber tenido una conversación sobre la misma materia con el licenciado González, de mi oficina, hace una semana?—R. No tan sólo con el licenciado González, con el licenciado Ruiz Nazario y a los tres le he hecho la misma observación.—P. ¿No es cierto que Ud. manifestó a los señores González y Ruiz Nazario y a mí que Cándido Fernández había solicitado de Ud. como Notario que legalizara la firma de Isidoro Alvarez en este documento que acabo de enseñarle, ofreciéndole una cantidad considerable si Ud. lo hiciera y que Ud. se había negado a hacerlo? —R. Creo que no debo contestar la pregunta porque la conversación sostenida por mí con el licenciado Brown, González y Ruiz Nazario fué completamente confidencial y manifestándoles antes que la conversación que tuviera en este asunto no podían hacer uso de ella ante la Corte, porque yo me negaría a declarar sobre eso.—Juez. ¿Hay algún artículo de la ley que le ampare a Ud. en eso?—Test. Apelo primero al código del honor y de la caballerosidad.—Juez. Se le pregunta sobre artículos de ley que esté en los códigos del derecho.— Test. Yo no conozco ninguno, pero por lo menos ésas fueron mis advertencias a ellos.—Ddo. P. ¿Ud. me manifestó que esto era privado y particular, antes de hacerme la declaración?—R. Sí, señor, Mr. Brown, que le dije que no me llamara a declarar en este asunto porque no me quería inmiscuir en él; igual al señor González y al señor Ruiz Nazario.—P. ¿Y yo no le contesté a Ud. que ningún abogado tenía el derecho de tapar un delito; que era su deber exponer hechos de esta índole si estuvieran en su conocimiento?—R. Ud. me expuso

eso pero es bajo la teoría de que Ud. considerara eso como un delito; ya era distinto. . . .—P. ¿Qué concepto podría tener una proposición a un Notario que legalizara la firma de una persona en un documento que lleva fecha anterior y que le va a ofrecer una cantidad considerable, si lo hiciera?—Dte. Eso es una pregunta hipotética que no hay nada en el récord que la sostenga. No se ha probado que eso haya sucedido, por el contrario, el compañero bajo juramento declara que el señor Fernández, profesionalmente le preguntó si era posible legalizar la firma y que él contestó que no era posible a menos que no fuera el señor Alvarez y que el señor Fernández se quedó conforme. —Ddo. P. Entonces queda en pie mi pregunta que el señor Soto Rivera se ha negado a contestar.—Juez. La corte ordena que la conteste. No hay nada en la ley ni se le ha demostrado a la corte que haya nada en la ley que impida al testigo contestar esa pregunta.—Dte. Esa pregunta tiende a impugnar la veracidad del propio testigo del Sr. Brown; no puede haberse hecho con otro fin, es decir, para establecer que la primera contestación del compañero bajo juramento no era cierta; en esas condiciones el compañero señor Brown está autorizado para ello pero debe anunciar a la corte que va a impugnar la declaración de su propio testigo, que le ha resultado hostil y que trata de impugnar su veracidad.—Ddo. No es para tachar la veracidad del testigo sino para demostrar que hizo declaraciones incompatibles en otra ocasión. El Art. 156 de la ley de evidencia dice: (Leyó)—Juez. Se admite la pregunta de acuerdo con el Art. 156 de la ley de evidencia. Conteste.—Dte. La pregunta es inmaterial a menos que sea para tachar la veracidad del testigo.—Juez. Del interrogatorio se desprende cuál es el fin de la pregunta y el resultado del interrogatorio en relación con el Art. 156 de la ley de evidencia. —Dte. Si la corte lo estima así, está bien.—R. Antes de contestar la pregunta, yo quiero sentar las bases para hacer mi contestación, señor Juez, porque no quiero que se ponga en duda por lo menos el secreto que yo pueda guardar de cualquier asunto que se traiga a mi bufete. Yo ignoro por quién el señor Ruiz Nazario supo que yo había tenido conocimiento de este documento. Se me preguntó y le dije. . . . No acostumbro ocultar la verdad. Posteriormente el señor Brown y el licenciado González y a ellos manifesté que por el señor Cándido Fernández se me había ofrecido pagar por la legalización de la firma, en las circunstancias en que esa firma podría legalizarse.—P. Lo que no entiendo de la contestación es la parte de las circunstancias en que la firma pueda legalizarse.—R. Las circunstancias que yo le expresé que podría legalizarse la firma, que declaré anteriormente.—P. ¿Ud. dijo algo de eso, de las circunstancias, de al-

guna consulta, o de las circunstancias en las cuales la firma podría legalizarse, a mí, a González, o a Ruiz Nazario?—R. Más o menos en palabras diferentes, pero ese mismo sentido.—Ddo. Nada más.—Dte. Nada, señor Juez.''

Después el abogado Sr. Brown declaró como sigue:

''Me llamo J. H. Brown; soy residente de San Juan y Abogado del demandado en este caso. Con motivo de manifestaciones de los señores Ruiz Nazario y Guillermo González y estando asociados conmigo en mi oficina creí necesario hablar con el licenciado José Soto Rivera con el fin de utilizarlo como testigo en este caso, y es bien delicado en ese sentido, pero como no lo había visto antes del día 24 de este mes, el día antes de empezar este juicio fuí a su oficina en el edificio Noa y esperaba en su sala de espera y él vino de su oficina particular. Y entonces yo le dije que los señores Ruiz Nazario y González me habían dicho que les había manifestado que el demandante en este caso, Cándido Fernández, se había presentado en su bufete pocos días después de la muerte de Benigno Díaz trayendo con él un documento en que se llevaba la firma de Isidoro Alvarez en el cual Isidoro Alvarez puso recibo de cuarenta y seis mil dollars pagados por Cándido Fernández a Benigno Díaz o entregados por Cándido Fernández a Benigno Díaz y que Cándido Fernández le había pedido que legalizara esta firma, haciendo constar que la firma se había puesto en el documento en presencia de él como Notario. El señor Soto Rivera me contestó que era cierto, que el señor Cándido Fernández había venido donde él con el documento y le había hecho esta proposición; que declarase que esta firma se había puesto en el documento en su presencia y que además le había ofrecido una cantidad grande de dinero o considerable con tal que hiciera esto y que él había rechazado la proposición y se había negado a hacerlo.

''Al manifestarle que pensaba preguntar en ese sentido a Cándido Fernández y caso que lo negara que lo llamaría como testigo me dijo que no hiciera eso; que eso era una cosa que él la había dicho particularmente a Ruiz Nazario. Que podría considerarse como una venganza que él intentaba contra Cándido Fernández porque él estaba demandando a Cándido Fernández y yo le dije que consecuente con mi deber de abogado con esta parte, era preciso llamarlo como testigo y que lo iba a hacer. Eso es todo.—Dte. Nada, señor Juez.''

Terminada la prueba del demandado, el demandante en refutación presentó al perito químico Sr. Angel Pesquera. Su declaración ocupa cuarenta y ocho páginas y es difícil

de resumir. Acompañó al perito del Valle en los experimentos que hizo. Una de sus afirmaciones es ésta: "La conclusión mía es la siguiente: que atendiendo a las pruebas a que se ha sometido este documento, por eliminación llegó a la conclusión de que nada ha sido escrito en la faz de este documento anteriormente a lo que contiene hoy escrito. Quiero decir que de las pruebas hechas no se ha demostrado eso." Refiriéndose a la anomalía observada en la *i* de la firma Isidoro Alvarez dijo que era un "flow back", esto es, que se debía a haberse corrido la tinta. Y con respecto a la firma entera concluyó: "Que la firma que aparece en el documento dos, fué originalmente puesta en ese documento por mano del hombre sin que haya sido copiada o trasladada de otro documento por medio mecánico alguno."

Tal fué, en resumen, la prueba que llevó a la corte sentenciadora a fallar el caso en contra del demandante.

■ Dijimos al principio de esta opinión que todos los errores señalados para pedir la revocación de ese fallo versan sobre la práctica y el peso de la evidencia. La primera cuestión que se levanta se refiere al error cometido por la corte de distrito al considerar como prueba el testimonio del abogado Sr. Brown cuando sólo podía tomarse en cuenta a los efectos de impugnar la veracidad de la declaración de Soto Rivera.

En su relación del caso y opinión la corte sentenciadora se expresó así:

"Después de lo que dejamos transcrito de las declaraciones prestadas en el juicio por los Licdos. J. H. Brown y José Soto Rivera, no podemos menos de llegar a la conclusión de que el demandante Cándido Fernández trató de que el Lcdo. José Soto Rivera, abogado-notario, mediante el ofrecimiento de una cantidad grande de dinero hecho por el demandante al Sr. Soto Rivera, hiciera constar que la firma de Isidoro Alvarez se había puesto en presencia del referido notario Sr. Soto Rivera, a lo cual se negó el referido Notario."

El artículo 156 de la Ley de Evidencia dice:

"A la parte que presentare un testigo no le será permitido tachar

su veracidad mediante evidencia de mala reputación; pero **podrá** contradecirle con otra evidencia, y asimismo probar que en otras **oca-** siones hubo de hacer declaraciones incompatibles con su actual testimonio, según lo dispuesto en el artículo ciento cincuenta y nueve.''

Y el 159 expresa:

''También podrá tacharse a un testigo mediante evidencia de que hizo, en otras épocas, manifestaciones incompatibles con su actual declaración; pero antes de poder hacer esto, habrá que referirle las manifestaciones, con las circunstancias de fechas, lugares y personas que se hallaban presentes; se le preguntará si hizo esas manifestaciones, y de haberlas hecho, se le permitirá que las explique. Si las manifestaciones se hicieron por escrito, deberán enseñarse al testigo antes de podérsele interrogar acerca de ellas.''

Siendo ello así, no hubo error en cuanto a la presentación y admisión de la prueba, pero sí lo hubo en cuanto al valor probatorio de la declaración del abogado Sr. Brown.

Ahora bien, ¿se trata de un error que lleve consigo la revocación de la sentencia? En manera alguna, a nuestro juicio, porque estudiando la relación del caso y opinión de la corte sentenciadora en su totalidad se concluye que independientemente de esa prueba la corte había formado su criterio contrario a la reclamación del demandante, y analizada por nosotros mismos la evidencia prescindiendo en absoluto de las declaraciones de Soto Rivera y de Brown o mejor dicho tomando en cuenta la declaración de Brown para prescindir de la de Soto Rivera, encontramos que es insostenible la reclamación del demandante.

█ Al discutirse los demás errores se imputa por la parte apelante al juez sentenciador pasión, prejuicio y parcialidad. No estamos conformes. Lo que se observa en sus conclusiones y manifestaciones no es el prejuicio, la pasión o la parcialidad, sino la sincera y natural reacción de una conciencia honrada ante el desarrollo de las circunstancias concurrentes en el caso puestas de manifiesto por la prueba. Quizá el juez hizo consideraciones innecesarias o indebidas, pero ello no vicia de nulidad la conclusión a que llegara.

■ De la prueba surge clara la condición personal de las tres figuras principales en el pleito: el demandante, el demandado y Benigno Díaz.

Descrito por sí mismo resulta el demandante un licorista a quien se le cierran sus fábricas por el Gobierno en varias ocasiones bajo la imputación de adulteración de fórmulas y mal uso del alcohol y continúa en el negocio poniendo sus empresas a nombre de otras personas, y que gana grandes sumas de dinero, hasta diez mil dólares en un día cuando le llevan diez *drums* de alcohol, y defrauda al Pueblo ocultando sus ganancias a los efectos del pago de la contribución sobre rentas. Hay insinuaciones en la prueba con respecto a cierto pleito sobre una pianola en que un recibo presentado por el demandante jugó un papel decisivo y en relación con el cobro de un pagaré negociado a Félix Torres de Caguas que no llegaron a materializarse bien, pero que analizadas en relación con el resto de la prueba completan el cuadro de la fisonomía moral del demandante.

Benigno Díaz no compareció personalmente ante la corte. Cuando el demandante se dirigió al demandado en la forma que conocemos, había ya muerto. Comenzó por un pequeño comercio en Caguas, extendiendo el radio de sus negocios a la compra y venta de tabaco y a la refacción de agricultores, pero no el de sus ganancias; al contrario, llegó a encontrarse tan sin recurso a mano que se sobregiró en su cuenta de banco por cerca de cuarenta mil dólares. Sus amigos intervinieron en su ayuda poniendo por condición que anulara el traspaso simulado que de ciertos bienes había hecho, pero nada consiguieron. En marzo de 1929 hizo esfuerzo por obtener un préstamo de treinta mil dólares sin éxito, suicidándose en abril a causa de su desesperada situación económica.

El demandado fué también comerciante en Caguas en pequeña escala y al igual que Díaz extendió el radio de sus negocios, pero actuando cautelosamente. En 1928 liquidó su comercio y fué a su tierra nativa, España. Regresó en 1929.

Su capital figura en los libros del Pueblo de Puerto Rico a los efectos del pago de contribuciones y está invertido en bienes conocidos. Su reputación en la comunidad es intachable, su cuenta de banco tenía en marzo de 1929 un saldo a su favor, y era sólido su crédito.

Demandante y demandado declararon bajo juramento ante la corte, y a los efectos de la credibilidad que sus testimonios merecen, su personalidad moral tiene importancia extraordinaria.

Declarando el demandante, se introdujo el documento en que funda su reclamación. Lo conocemos. Es una carta dirigida a Díaz que contiene al pie un recibo de depósito de cuarenta y seis mil dólares. Dijo el demandante que estaba firmado por el demandado porque así se lo manifestó Díaz al entregárselo. Cuando el demandado fué requerido de pago por el demandante en la forma vaga que también conocemos, por telégrafo contestó que no había firmado documento alguno y que nada debía, y en el juicio se sostuvo en su actitud. Sobre el demandante recaía, pues, el peso de la prueba sobre la verdad del documento y de la transacción a que el mismo se refiere.

El demandante no vió firmar el documento al demandado. Ni siquiera conocía su firma. No había hablado con él sobre la transacción. Su negocio con Díaz fué todo de palabra. Se encuentra con él en las calles de San Juan y accede en seguida a entregarle cuarenta y cinco mil dólares, haciéndose cargo de su devolución una persona que aun desconoce. Al día siguiente le entrega el dinero con la sola garantía del documento privado que le entrega Díaz. Dijo que tenía plena confianza en éste y que no conoció su difícil situación financiera hasta después de su muerte. Sin embargo, la propia carta habla de momentos decisivos para Díaz.

Nadie se enteró del trato entre el demandante y Díaz, nadie de la entrega del documento. Sólo el testigo Miró fué a la casa en la tarde del 23 de marzo de 1929 y vió que el

demandante entregaba a un desconocido muchos billetes de banco y que había una maleta en la mesa.

Quizá pueda darse en la realidad de la vida una transacción como ésa, pero hay que confesar que impresiona por lo rara. Escuetamente expuesta, sin prejuicios de ninguna especie, la mente duda de que tan fácilmente y en tal forma se desprenda un hombre de cantidad semejante.

Y la duda crece cuando se estudia la prueba aportada por el propio demandante para corroborar su testimonio, porque las declaraciones de Camacho y de Vélez son tan sospechosas en sí mismas, que aumenten la incertidumbre.

El encuentro del demandado con Camacho en Caguas y el envío de la carta a Díaz, y la remisión por Díaz al demandado del sobre abierto contentivo del recibo que Camacho lee y preserva en la memoria de modo tan perfecto que lo recita vez tras vez con todos sus detalles como si estuviera leyéndolo, causan sorpresa, que crece cuando el testigo narra la manera cómo se enteró de ello el demandante, y cuando luego Alvarez declara que veía pasar todos los días por su casa a Don Benigno, no existiendo la más leve necesidad de emplear a otra persona para comunicarse con él.

El otro encuentro de Díaz con Vélez con quien sólo tenía una amistad pasajera y el encargo que le hace en los primeros días de abril cuando se entera de que viene para San Juan, encargo que requiere que Vélez deje el vehículo en que viaja antes de llegar a su destino y penetre en una casa a entregar no sólo una maleta sino a dar un recado de que faltaban trescientos dólares en los paquetes de a cien, no es sólo dudoso, es increíble si se tiene además en cuenta lo dicho por el mismo demandante sobre sus constantes relaciones con Díaz y el uso que hacía Díaz de Blas Delgado en sus negocios de San Juan.

¿Qué aporta la prueba pericial caligráfica? En el resumen que de ella hicimos nos limitamos a transcribir las conclusiones de los peritos y a nuestro juicio la misma ausencia de toda duda que en ellas se advierte, debilita su crédito.

En tal virtud, analizada en sí misma la evidencia del demandante, deja en el ánimo del juzgador una impresión de rareza, de incertidumbre. Y esa impresión se agranda y robustece al apreciar la prueba de la parte demandada de tal modo que ningún tribunal de justicia podría considerarse justificado en dictar una sentencia en este caso favorable al demandante aunque ese tribunal a conciencia no pudiera resolver de modo categórico si la firma que aparece al pie del documento fué puesta o no por la mano del demandado Isidoro Alvarez.

La declaración de éste es clara, terminante, lógica aun en los momentos en que parece vacilar, y está sostenida por todo el resto de su prueba.

Su situación pecuniaria era desahogada. Sólido su crédito. En marzo de 1929, cuando liquidado ya su comercio vuelve a la Isla, su capital estaba invertido en bienes inmuebles y en préstamos garantizados con hipotecas, mostrando un saldo a su favor su cuenta de banco.

No hay un átomo de prueba fuera del documento impugnado que demuestre que debiera algo a Díaz. Tenía buenas relaciones con él y pequeñas transacciones. Su apoderado declaró que todo fué debidamente liquidado. Es más, cuando en marzo Díaz lucha desesperadamente por obtener un préstamo de treinta mil dólares y presenta estados de su activo y pasivo a los bancos, en ninguno de ellos consigna crédito alguno a su favor y en contra del demandado. Además, ¿cómo es posible que si el demandado hubiera debido a Díaz éste no lo hubiera requerido de pago en aquellos momentos, o no hubiera siquiera utilizado abiertamente su firma para obtener el préstamo deseado, cuando el crédito de Alvarez en los bancos estaba en las mejores condiciones? Una relación de negocios de cuarenta y cinco mil dólares deja necesariamente algún rastro indeleble y nada, absolutamente nada se aportó en relación con el origen, motivo y desarrollo de relación tan fuerte.

Se dirá que Díaz cobró su deuda al demandado por medio

del demandante. Entonces, ¿qué hizo de suma tan crecida? Ni un depósito en los bancos en efectivo, ni un solo pago, la continuación de sus gestiones del préstamo de treinta mil dólares y finalmente el suicidio por no poder hacer frente a sus compromisos, es lo que pone de manifiesto la prueba con respecto a Díaz durante ese período.

Queda aún el documento y a destruirlo en sí mismo tendió la prueba pericial del demandado contradicha por la otra prueba pericial de igual naturaleza presentada en refutación por el demandante. A nuestro juicio esa prueba pericial no es decisiva, pero ilustra la conciencia del juzgador en el sentido de la posibilidad de haberse obtenido una firma genuina del demandado y haberse hecho desaparecer lo escrito anteriormente sustituyéndolo por lo que actualmente aparece. Y en esa línea existe además la referencia al incidente del demandado con Félix Torres y la insinuación a la relación de Torres con el demandante en el asunto del pagaré de Jiménez.

El hábil abogado del demandante hace en su alegato esfuerzos extraordinarios para presentar como perjuro al demandado porque en su declaración persiste en declarar que la firma que aparece al pie del documento no es la suya cuando él mismo se refirió al incidente de Torres y la teoría de su defensa admite que la firma es genuina.

Hemos analizado esa parte de la declaración del demandado que es la que teníamos en mente cuando refiriéndonos en general a ella dijimos que era "lógica aun en momentos en que parece vacilar." Cuando el demandado contrainterrogado insistentemente se enfrenta con la firma y el documento, firma y documento enlazados, su dicho de que la firma no es la suya pudiendo serlo quizá, es perfectamente lógico y congruente. Ante su conciencia lo que prevalece es el conjunto y como éste es falso, niega la verdad de la firma. La explicación que puedan dar sus inteligentes defensores, es una hipótesis. La realidad ante él es que él no ha podido escribir aquel nombre porque jamás contrajo aquella obliga-

ción. Y lo niega. ¿Y quién puede asegurar que no esté diciendo la verdad?

La verdadera teoría de la parte demandada donde debe buscarse es en su contestación. La declaración de su perito químico tiende a proporcionar una explicación a la corte para el caso de que ésta quedara convencida de que la firma era auténtica. Ante la gravedad del caso, ante los varios medios que pudieron ponerse en práctica para prepararlo, el demandado niega y explica a la vez, sin que la afirmación que la explicación pueda llevar consigo esté en contradicción con la negativa. Esta subsiste, porque de modo consistente se sostiene siempre que la obligación que se reclama jamás fué contraída y que el documento en una forma o en otra no es genuino.

Por virtud de todo lo expuesto y por lo que los hechos hablan además por sí mismos, estimamos que estuvo acertada la corte sentenciadora en su conclusión fundamental que la llevó a desestimar la demanda, y en su consecuencia que debe declararse sin lugar el recurso y *confirmarse la sentencia recurrida.*

El Juez Asociado Señor Córdova Dávila no intervino.